# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Liberty Bell Temple III, *et al.*,

    Plaintiffs,

v.

Trenton City Police Department, *et al.*,

    Defendants.

Civil Action No.
3:16-cv-1339 (PGS) (LHG)

**MEMORANDUM
AND ORDER**

**SHERIDAN, U.S.D.J.**

  This matter comes before the Court on two motions to dismiss filed by all Defendants in this action. (ECF Nos. 125, 130). Defendants are seeking dismissal of the Third Consolidated Amended Complaint ("TCAC") filed by Plaintiffs Liberty Bell Temple III and Edward Forchion, wherein Plaintiffs raised several claims: unlawful seizure (counts 1 and 2); substantive due process violations (counts 3-6); procedural due process violations (counts 7, 13, 14, 17 and 18), violation of the equal protection clause (counts 8-9); first amendment retaliation (counts 10-11); failure to train under *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978) (count 12); negligence (counts 15, 16, 19-23, 25-27); conversion (counts 24, 28); *respondeat superior* liability (count 29); and malicious prosecution (count 30). Plaintiffs also seek "special damages in an amount of at least $80,000" (count 31); punitive damages (count 32); and attorney fees (count 33). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

### PARTIES

Plaintiff Edward Forchion ("Plaintiff" or "Forchion") is a well-known marijuana activist in New Jersey known to many as "NJ Weedman." (TCAC ¶ 26, ECF No. 119). In 2015, Forchion opened a restaurant called The Joint, and The Temple (together, "The Joint"), in Trenton, New Jersey. (*Id.* ¶ 27). Throughout its operations, The Joint "displayed colorful signs encouraging the legalization of marijuana." (*Id.* ¶ 28). The Joint is in a zoning district designated for business purposes. (*Id.* ¶¶ 29, 34). The Joint is located across the street from Trenton City Hall (*Id.* ¶ 29), and in close proximity to a federal courthouse.

The TCAC names the following Defendants[1]: the City of Trenton; Earnest Parrey, the Police Director of the Trenton Police Department (TPD) and policymaker with regard to officer training; Edelmiro Gonzalez, Jr., a TPD captain; Yolanda Ward, a TPD detective; Herbert Flowers, a TPD police officer; Richard Kachmar, the Clerk for the City of Trenton; Sheehan Miles, a TPD police officer; Brian Suschke, a TPD sergeant; William "Bill" Haumann, an assistant prosecutor and the Chief of Forfeiture at the Mercer County Prosecutor's Office ("MCPO"); Brian Hawkins, owner and operator of Hawk's Recovery and Towing, Inc. ("Hawk's Towing"); Hawk's Towing; Angelo Onofri, the prosecutor at MCPO; John Boyle, an assistant prosecutor at MCPO; Stephanie Katz, an assistant prosecutor at the MCPO; and Kimberly Wilson, the Chief Municipal Prosecutor at the Trenton Department of Law. (*Id.* ¶¶ 7-25).

---

[1] The titles of Defendants reflect their positions at the time of the events alleged in the TCAC.

### i. THE FEBRUARY 28, 2016 INCIDENT

On February 28, 2016, TPD officers arrived at The Joint to enforce a Trenton noise ordinance and forced everyone to leave the premises. (*Id.* ¶ 40). Plaintiffs allege that the TPD officers arrived at The Joint "after 11 p.m. but before 2 a.m." (*Id.* ¶ 40). Plaintiffs allege, on information and belief, that Defendant Gonzalez and other Defendant TPD officers had no reasonable suspicion that a crime had been committed when they ordered everyone to vacate The Joint. (*Id.* ¶ 41). Plaintiffs further allege, upon information and belief, that Defendant Gonzalez made "false statements in an affidavit by stating that he and the other Defendant Officers were dispatched to Forchion's business [on February 28, 2016] in response to reports of disorderly conduct involving a street fight." (*Id.* ¶ 42). Plaintiffs also allege that "Defendant Officers filed false police reports on Forchion regarding, *inter alia*, Forchion operating his business after 11 p.m. (but before 2 a.m.)." (*Id.* ¶ 43).

Defendants—relying on a police report (City Defendants' Moving Brief, Ex. 5, February 28, 2016 Trenton Police and Fire Event Report)—dispute Plaintiffs' account of what occurred on the evening of February 28, 2016. Defendants contend that: the TPD officers were responding to a call reporting a street fight at approximately 2:30 a.m.; the customers in The Joint had exited the restaurant prior to the officers' arrival; and officers at the scene observed several men fighting and a crowd of about thirty people in front of the restaurant. (*See id*).

### ii. DEFENDANTS "WAGE A CAMPAIGN AGAINST" PLAINTIFFS

Plaintiffs allege that Defendants "waged a campaign against" Forchion and The Joint. (*Id.* at ¶ 46). TPD officers allegedly targeted and stopped The Joint's customers and instructed them

---

[2] For purposes of the instant motions, Plaintiffs' allegations in the TCAC are accepted as true.

not to patronize the business. (*Id.*). In addition, TPD officers contacted neighboring businesses to prohibit The Joint's customers from using their parking lots, and the police began to routinely park police vehicles near the business. (*Id.* ¶¶ 47-48). Plaintiffs contend that these actions resulted in significant financial losses. (*Id.* ¶ 49).

TPD officers also "routinely" issued citations to The Joint for violating Trenton Ordinance § 146-22(A) (the "Ordinance"), which governs the operating hours of businesses:

> A. No establishment on a premises whose building or grounds are closer than 100 feet to the closest point of the building or grounds of a residential property situated within any residential zone of the City shall not be open for business or conduct business or invite or permit access by the general public for any purposes between the hours of 11:00 p.m. of any day and 6:00 a.m. of the following day, prevailing time.
>
> B. During the hours of closing prescribed herein the property shall be securely closed against access by the public to the building and to the parking areas by the use of appropriately sized and placed fencing, posts or chains and by posting "No Trespassing" signs.
>
> C. Locations that operate primarily as a licensed alcoholic beverage premises shall not be open for business or conduct business or allow the service, consumption, or delivery of any alcoholic beverage directly or indirectly during the hours as set by § 10-5 of the City of Trenton Code.
>
> D. At no time shall any business, operation or establishment other than a licensed alcoholic beverage premises be allowed to operate between the hours of 2:00 a.m. and 6:00 a.m.

(Trenton, N.J. Code § 146-22; TCAC ¶ 30). Plaintiffs claim that based on The Joint's proximity to a residential property, the Ordinance only restricts him from operating the business from 2:00 a.m. to 6:00 a.m. (TCAC ¶¶ 32-39). Plaintiffs further allege that TPD officer filed several false reports regarding The Joint's operation after 11 p.m (but before 2 a.m.). (*Id.* ¶¶ 43, 44).

### iii.   FORCHION IS RETALIATED AGAINST FOR FILING THE INSTANT ACTION

In response to Forchion initiating this action alleging, *inter alia*, the allegations set forth above, he alleges that "even more police harassment was perpetuated on Mr. Forchion and his business patrons." (*Id.* ¶ 51). TPD officers continued issuing citations and continued parking police vehicles outside of The Joint. (*Id.*).

### iv.   TPD OBTAINS AND EXECUTES A SEARCH WARRANT AND SEIZES PLAINTIFFS' PROPERTY

On April 18, 2016, law enforcement obtained a warrant authorizing a search of The Joint. (City Defendants' Moving Br., Ex. 9, April 18, 2016 Search Warrant). On April 27, 2016, TPD officers conducted a raid on the business, arresting Forchion for marijuana offenses and seizing his two vehicles. (TCAC ¶ 52). The TPD officers also seized the surveillance video from February 28, 2016, and "two silver portable hard drives containing computer files, including business records and hours of video and valuable intellectual property." (*Id.* ¶¶ 53, 55). "[N]o steps were taken . . . to initiate forfeiture proceedings against the DVR surveillance video" or the hard drives. (*Id.* ¶¶ 54, 56).

### v.   FORCHION'S VEHICLES ARE SEIZED

The two vehicles seized by the TPD during the April 27, 2016 search were: (1) Forchion's "iconic" NJ WEEDMAN Van, a multicolored 1986 Ford Econoline e150; and (2) his delivery car, a blue Toyota Matrix. (*Id.* ¶ 52).

TPD officers allegedly informed him that forfeiture proceedings would commence against the vehicles within sixty to ninety days, but no such proceedings ever took place. (*Id.* ¶¶ 59-61). Instead, officers obtained a search warrant for the van and the title was transferred to Defendant Hawk's Towing as the van was deemed abandoned. Then Hawk's Towing, after obtaining the title to the van, crushed and destroyed the van. (*Id.* ¶¶ 59, 63-65).

Forchion was not notified of the status of any forfeiture proceeding and was not notified that the van was considered abandoned and would be crushed. (*Id.* ¶ 68). In fact, when Forchion noticed that forfeiture proceedings had commenced against a sum of money and not the van, he contacted TPD. Defendant Suschke advised him that the prosecutor was not seeking forfeiture of the van, and that is was located at Hawk's Towing. When Forchion contacted Hawk's Towing, Defendant Brian Hawkins, the owner of Hawk's Towing, told him that the property had been deemed abandoned, and was stripped for scrap and crushed. (*Id.* ¶ 63).

Plaintiff contends Defendant Haumann, as chief of the Mercer County Prosecutor's Office forfeiture unit, failed to notify Forchion that the vehicles were not subject to forfeiture proceedings. (*Id.* ¶¶ 71-72), and that Defendants Hawkins and Hawk's Towing failed to notify Forchion that his van was deemed abandoned. (*Id.* ¶ 75).

The Mercer County Prosecutor's Office held the delivery car for two years and only returned it to Forchion after his lawyers made "multiple calls." (*Id.* ¶ 79).

### vi.  FORCHION PROTESTS AND LATER GETS ARRESTED FOR CYBER BULLYING

On May 10, 2016, a strange incident took place, which commenced with Forchion standing outside of The Joint holding a sign that stated, "We R Open Fuck the Police" and shouting "Fuck the police" as TPD officers parked nearby. (*Id.* ¶ 80). Forchion and Defendants Flowers then engaged in a verbal altercation, during which Forchion accused Flowers of being a pedophile. (*Id.* ¶¶ 81-83). A third party recorded the verbal exchange and posted it on social media. (*Id.* ¶ 84). As a result, Forchion was later arrested and charged with cyber bullying. (*Id.* ¶ 86). Forchion alleges the arrest was because of his civil action, his anti-police sign, and his anti-police rhetoric. (*Id.* ¶ 87). Forchion also alleges that thereafter, the police increased surveillance of his business and issued even more citations for allegedly violating the Ordinance. (*Id.* ¶¶ 88-89).

6

Defendants dispute the circumstances surrounding this incident, contending that Forchion "used foul language directed at Flowers" and Forchion had "posted information online [about] his interaction with Flowers relating to his assertions that Flowers allegedly being a pedophile." (City Defendants' Moving Br. at 26; *see also id.*, Ex. 12, May 10, 2016 Trenton Police and Fire Event Report). Defendants also note that a criminal complaint was filed against Plaintiff for cyber harassment, in violation of N.J.S.A. 2C:33-4.1(a)(2). On September 15, 2016, a grand jury returned an indictment against Forchion. (*See id.*, Ex.14, Mercer County Indictment No. 16-09-0720).

**vii.   THE JOINT'S BUSINESS LICENSE IS REVOKED**

Thereafter, Defendants allegedly decided to revoke the The Joint's business license based on "sham" violations of the Ordinance. (*Id.* ¶¶ 90-91). Plaintiff claims that those Defendants sent notice of the revocation hearing to Forchion's former residential address, rather than the address of The Joint, so that Forchion would not have "a chance to fight back." (*Id.* ¶¶ 95-99). However, the notice was sent to the same address that Plaintiffs provided in their business license application when The Joint opened in 2015. (*See* City Defendants' Moving Br., Ex. 2, Business/Peddler's License Application for NJ Weedman's Joint; *see also id.*, Ex. 18, September 19, 2016 Letter from Trenton City Clerk to Edward Forchion).

By letter dated September 19, 2016, The Joint's business license was revoked effective September 21, 2016. (*Id.* ¶ 100). Plaintiff appealed the license revocation, and at least one notice relating to the appeal was mailed to 322 E. State Street—the location of The Joint. (*See* City Defendants' Moving Br., Ex. 19, September 26, 2019 Letter from Trenton City Clerk to Edward Forchion).

On September 23, 2016, Defendant Miles entered the business, announced that it was closed, and ordered the staff and customers to exit or be arrested. (*Id.* ¶ 101). This was the first time Forchion learned of the license revocation. (*Id.*). Three days later, Forchion spoke to Defendant Kachmar (the Trenton City Clerk) who admitted that "he made a mistake" and reinstated the license. (*Id.* ¶ 103). Plaintiffs contend that this incident caused significant financial losses because customers stopped patronizing the business. (*Id.* ¶ 104).

### viii. FORCHION SECURES DISMISSAL OF SEVERAL TPD ISSUED CITATIONS

In total, Defendants issued thirteen citations against Forchion for violating the Ordinance, as well as issued ten additional citations. (*Id.* ¶¶ 106, 109). Defendant Wilson oversaw the prosecutions of the Ordinance violations. (*Id.* ¶ 25).

On February 6, 2018, the Trenton Municipal Court dismissed all thirteen citations against Forchion relating to violations of the Ordinance. (*Id.* ¶ 105). On June 20, 2018, the remaining ten municipal violations against Forchion were summarily dismissed. (*Id.* ¶ 108). Plaintiff contends that the officers had no probable cause to issue any of the citations against him and that they knew they lacked probable cause. (*Id.* ¶¶ 106-107, 109-110). He contends the citations were issued "to intimidate, harass, exact revenge, silence Mr. Forchion's voice, revoke his business license, and shut down his business." (*Id.* ¶ 111).

### ix. FORCHION FILES ANOTHER SUIT AND IS ARRESTED FOR WITNESS TAMPERING

Forchion initiated another civil action, alleging a conspiracy to entrap him in connection with the April 27, 2016 search of his property. Forchion named a confidential police informant as a defendant in that action. (*Id.* ¶ 113). Because he named and contacted the informant's household, Forchion was arrested and charged with two counts of witness tampering. (*Id.* ¶ 114). Forchion was denied bail and detained for over four hundred days. (*Id.* ¶ 115). A jury ultimately acquitted

him of the witness tampering charges. (*Id.* ¶ 116). Forchion claims there was no probable cause to support the witness tampering charges and that the purpose of the charges were to intimidate and harass him, exact revenge for filing a lawsuit, shut down his business, and silence him. (*Id.* ¶¶ 117, 121).

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule Civil Procedure 12(b)(6), the Court is required to accept as true all allegations in the TCAC and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Reed v. Cameron*, 380 F. App'x 160, 162 (3d Cir. 2010) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court will accept well-pleaded allegations as true for the purposes of these motions, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000).

"[A] court may consider certain narrowly defined types of material without converting the motion to dismiss" into a motion for summary judgment, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999), including documents "*integral to or explicitly relied upon in the complaint.*" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Such material includes "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256 260 (3d Cir. 2006). The Court rendered a decision with respect to which documents it would consider in two memoranda, which were filed on the docket in this action on January 23, 2019, and February 7, 2019. (ECF Nos. 140, 147).

**LEGAL ANALYSIS**

In this action, Plaintiffs assert that a variety of state actors infringed upon their constitutional rights. As such, Plaintiffs bring several causes of action under 42 U.S.C. § 1983. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005). Separately, Plaintiffs also bring several tort claims against state actors, as well as private parties. The Court will first discuss the claims brought under § 1983, which will logically begin with an analysis of which, if any, Defendants are entitled to immunity from suit, and thereafter examine Plaintiffs' negligence claims.

**i.  IMMUNITY ANALYSIS**

PROSECUTORIAL IMMUNITY

Defendants contend that Defendants Onofri, Wilson, Haumann, Boyle, and Katz are entitled to absolute prosecutorial immunity. "Most public officials are entitled only to qualified immunity" in 42 U.S.C. § 1983 actions. *Yarris v. Cnty. of Delaware*, 465 F.3d 129, 135 (3d Cir. 2006). State prosecutors, however, "are absolutely immune from liability under § 1983 for actions performed in a quasi-judicial role." *Light v. Haws*, 472 F.3d 74, 77 (3d Cir. 2007); *see also Imbler*

10

*v. Pachtman*, 424 U.S. 409, 427, 431 (1976). This immunity applies to "activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior 'intimately associated with the judicial phases' of litigation." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992). The immunity does not extend to administrative or investigatory duties or to duties that "do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). To illustrate these principles, the Third Circuit has held that "a prosecutor seeking a . . . warrant is performing 'the preparation necessary to present a case' and such preparation is encompassed within the prosecutor's advocacy function," and thus such actions are entitled to absolute immunity. *See Schrob v. Castterson*, 948 F.2d 1402 (3d Cir. 1991). It is the prosecutor's burden to prove "she was functioning as the state's 'advocate' while engaging in the alleged conduct that gives rise to the constitutional violation." *Yarris*, 465 F.3d at 136.

A. Defendant Wilson

Defendant Wilson was the Chief Municipal Prosecutor at the City of Trenton Department of Law. (TCAC § 25). Plaintiffs allege that on two separate occasions, she "ensured and oversaw" thirteen and ten municipal cases, respectively, against Forchion despite lacking probable cause to do so. (*Id.* §§ 107, 110, 111, 144, 148, 190). Plaintiffs' claims against Defendant Wilson purportedly stem from Plaintiffs' contention that there was not probable cause to prosecute the cases in municipal court, and the purpose of initiating those proceedings was to "harass and intimidate Mr. Forchion, silence his voice in the community, strip him of his business license, shut down his business," *inter alia*. (*See id.* § 190). The Court finds, however, that under the facts and circumstances alleged in the TCAC, Defendant Wilson is immune from suit because it appears that she was acting in a prosecutorial function in a overseeing the prosecutions alleged. *See Duffy*

*v. Freed*, 452 Fed. App'x 200, 202 (3d Cir. 2011). Thus, all claims, or counts ten, eleven, and thirty, are dismissed as interposed against Defendant Wilson.

B. DEFENDANTS ONOFRI, BOYLE, AND KATZ

According to the TCAC, Defendant Onofri was the lead prosecutor who prosecuted the 2017 witness tampering charges against Forchion. (TCAC § 22, 115). Defendant Onofri allegedly supervised Defendants Boyle and Katz in connection with the witness tampering case. (*Id.* § 22). Plaintiffs allege that Defendants Onofri, Boyle, and Katz knew there was no legitimate probable cause for the presentment of the witness tampering charges to the grand jury, nor the prosecution of those charges, and were bought "out of a retaliatory animus." (*See id.* §§ 119, 120, 144, 148, 191). Absolute immunity extends to "any hearing before a tribunal which performed a judicial function." *Burns v. Reed*, 500 U.S. 478, 490 (1991); *see also Allen v. Thompson*, 815 F.2d 1433 (11th Cir. 1987). Here, the allegations in the TCAC relate solely to these Defendants' conduct in prosecuting the 2017 witness tampering case against Forchion. Under these circumstances, the Court is satisfied that absolute prosecutorial immunity extends to the allegations in the TCAC with respect to Defendants Onofri, Boyle, and Katz. Thus, all claims, or counts ten, eleven, and thirty, are dismissed as interposed against Defendants Onofri, Boyle, and Katz.

C. DEFENDANT HAUMANN

Defendant Haumann was an assistant prosecutor and the Chief of Forfeiture at the Mercer County Prosecutor's Office. (TCAC §§ 19, 69). Plaintiffs allege that Defendant Haumann failed to notify Forchion that forfeiture proceedings would not be take taken against Forchion's van, which, as discussed above, was seized by the police. (*See id.* § 155). Plaintiffs also allege that Defendant Haumann allegedly failed to send notification to Forchion that his van was deemed abandoned. (*Id.*). As a result, the van was later destroyed. (*Id.*). Because Defendant Haumann

allegedly failed to provide Forchion notice or an opportunity to be heard, Forchion asserts that he was permanently deprived of his property interest in the van. (*Id.*). Similarly, Plaintiffs allege that Defendant Haumann failed to notify Forchion that forfeiture proceedings would not be taken against Forchion's delivery car, which was also seized by the TPD. (*Id.* § 163). As a result, the delivery car remained in Mercer County custody for approximately two years, which allegedly deprived Forchion of his property interest in the vehicle. (*Id.*).

The decision whether to initiate forfeiture proceedings, is covered by absolute prosecutorial immunity. *Schrob*, 948 F.2d at 1419. However, a prosecutor's management of seized property after forfeiture proceedings or once the decision has been made not to initiate forfeiture is entitled only to qualified immunity. *Id.* at 1419. That is, management of seized property is only covered by qualified immunity because it is "not directly related to the judicial process" but involves "acting in an administrative role." *Id.*; *see also Coleman v. Turpen*, 697 F.2d 1341, 1346 (10th Cir. 1982). The Third Circuit has consistently afforded prosecutors who managed seized assets only qualified immunity. *See, e.g.*, *Wrench Transp. Sys. v. Bradley*, 212 Fed. Appx. 92, 99-100 (3d Cir. 2006) (prosecutors who delayed return of seized truck until plaintiff released them from liability entitled to at best qualified immunity); *Reitz v. County of Bucks*, 125 F.3d 139, 147 (3d Cir. 1997). Therefore, Plaintiffs' allegations, which are taken as true for purposes of these motions, including that Defendant Haumann intentionally failed to mail Forchion notice, relates to an administrative duty that is *not* entitled to absolute immunity.

For the reasons stated in this section, all claims against Defendants Onofri, Wilson, Boyle, and Katz are dismissed on the basis of absolute immunity. However, the Court will not dismiss all claims against Haumann on absolute immunity grounds; the claims interposed against him are analyzed below.

"The procedural difference between absolute and qualified immunity is significant. Absolute immunity defeats a lawsuit at the outset, while an official with qualified immunity must establish that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schrob*, 948 F.2d at 1407 n.5. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"[3] *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011). "[A]ll but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity. *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 162 (3d Cir. 2017). Qualified immunity may apply to prosecutors who are not otherwise entitled to absolute immunity. *See Hof v. Janci*, No. CV 17-295, 2018 WL 6318381, at *5 (D.N.J. Dec. 3, 2018)

Whether each remaining Defendant, who is state actor, is entitled to qualified immunity requires an analysis unique to each individual count. The Court will therefore address each Defendants' entitlement to qualified immunity with respect to each claim, where applicable, below.

---

[3] "A court may address these prongs in either order in light of the circumstances in the particular case." *Curtis v. Wetzel*, 763 Fed. App'x 259, 263 (3d Cir. 2019); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

ii.     **"F<span>AILURE TO</span> T<span>RAIN</span>"** *M<span>ONELL</span>* **C<span>LAIM</span> A<span>GAINST THE</span> C<span>ITY OF</span> T<span>RENTON</span>** (C<span>OUNT</span> 12)

In count 12, Plaintiffs allege that Defendant Parrey failed to "properly train, supervise, or discipline police officers in various areas." (TCAC ¶ 151). As a result of Defendant Parrey's alleged failure to train, Plaintiffs contend that Defendant City of Trenton "violated Mr. Forchion's rights with deliberate indifference." (*Id.*).

It is well established that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* But, to satisfy § 1983, a municipality can only be held liable where it fails to train such employees with "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Connick*, 563 U.S. at 61. "A plaintiff may show deliberate indifference in a failure-to-train case in one of two ways: (1) through a pattern of similar constitutional violations providing a municipal actor with notice of the need for training; and (2) demonstrating 'single incident' liability for circumstances in which training is obviously necessary to avoid constitutional violations." *Khalil v. City of Paterson*, No. 18-3241 (JLL), 2018 WL 6168191, at *4 (D.N.J. Nov. 26, 2018).

Here, Plaintiffs fail to adequately allege the City of Trenton's "deliberate indifference" with respect to its purported "failure-to-train." Specifically, Plaintiffs fail to plausibly allege: (1)

that the City of Trenton had any relevant policies or customs specifically regarding any of the practices at issue; (2) that the City was on notice of a pattern of similar constitutional violations; or (3) that the City's need to train officers was "'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights,' even without a pattern of previous violations." *Khalil*, 2018 WL 6168191, at *6. In short, the Court finds Plaintiffs' allegation that the "City of Trenton has violated Mr. Forchion's rights with deliberate indifference, and it is liable to Mr. Forchion for all permissible damages" to be conclusory and insufficient to set forth a § 1983 claim for failure to train against the City. Count 12 is therefore dismissed, as is the City of Trenton as a Defendant in this action.

### iii.   § 1983 SUPERVISORY LIABILITY

State actors sued in their capacities as "supervisors" under § 1983 can only be found liable if: (1) with "deliberate indifference to the consequences, [they] established and maintained a policy, practice or custom which directly caused the constitutional harm," or (2) they "'participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced' in the subordinate's unconstitutional conduct." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd in part on other grounds sub nom, Taylor v. Barkes*, ___ U.S. ___, 135 S. Ct. 2042 (2015) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)); *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010). In addition, to state a claim of supervisory liability, "a plaintiff must allege a causal connection between the supervisor's direction and that violation, or, in other words, proximate causation." *Santiago*, 629 F.3d at 130. "Proximate causation is established where the supervisor gave directions that the supervisor 'knew or should reasonably have known would cause

others to deprive the plaintiff of her constitutional rights.'" *Id.* (quoting *Conner v. Reinhard,* 847 F.2d 384, 397 (7th Cir.1988)).

Here, it is not entirely clear from the TCAC (or Plaintiffs' opposition brief) precisely which counts allege supervisory liability against which Defendants. Based on the language used throughout, it appears that Plaintiffs allege supervisory liability as against: (1) Defendant Parrey, with respect to counts 1-11, 13, 15, 17, and 19; (2) Defendant Gonzalez, with respect to counts 3-11, 13, 15, 17 and 19[4]; and (3) Defendant Suschke, with respect to counts 1-11.

The vast majority of Plaintiffs' allegations premised upon supervisory liability are conclusory and cannot withstand Defendants' 12(b)(6) motion. Plaintiffs' conclusion that Defendant-supervisors Parrey, Gonzalez, and Suschke are liable appears numerous times throughout the TCAC: "Under the direction, knowledge, supervision, or ratification of Director Parrey, Captain Gonzalez, Sgt. Suschke, or agents of the foregoing . . . ." (*See, e.g.,* TCAC ¶¶ 43, 44, 46, 47, 48, 51, 53, 87, 88, 90, 91, 95, 96). However, Plaintiffs' allegations, for the most part, fail to raise a plausible inference that these Defendants "established and maintained a policy, practice or custom which directly caused [Plaintiffs] constitutional harm" or personally "'participated in violating [Plaintiffs'] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced' in the subordinate's unconstitutional conduct." *Barkes*, 766 F.3d at 316. Nor do Plaintiffs' conclusory allegations reveal a causal connection between these supervisors' direction and the alleged violations. *Santiago*, 629 F.3d at 130. This is particularly the case with respect to Defendants Gonzalez and Suschke.

---

[4] Although Gonzalez is named in counts 1 and 2, the TCAC, the Court considers those Counts as against Gonzalez not to be based on supervisory liability.

The Court's finding is not without two exceptions, however. *First*, in count 12—Plaintiffs' *Monell* claim against the City of Trenton—Plaintiffs allege, in relevant part, that "Defendant Parrey, as director of the police department, had knowledge of the long-running abuse—by his participation (on information and belief) and also by Mr. Forchion's lawsuit and the press generated by the police's actions—and took no reasonable steps to stop them." (TCAC ¶ 151). This allegation, coupled with totality of the other allegations in the TCAC, is sufficient to state a claim based upon supervisory liability against Defendant Parrey. Therefore, the Court will decline to dismiss Plaintiffs' claims as interposed against Defendant Parrey.

*Second*, in Counts 10 and 11—both of which are First Amendment retaliation claims–Plaintiffs allege: "Defendant Suschke ordered Trenton Police Officers to issue Mr. Forchion unfounded summonses for allegedly violating an 11 p.m. curfew, despite the fact that he knew the 11 p.m. curfew did not apply to Mr. Forchion's business." (TCAC ¶¶ 144, 148). There appears to be conflicting authority as to whether directing another to violate a plaintiff's constitutional rights constitutes supervisory liability, *see Santiago*, 629 F.3d at 130, or liability based on personal involvement, *see Williams v. Papi*, 714 Fed. App'x 128, 133 (3d Cir. 2017). In any event, the Court will engage in an analysis of the merits of Plaintiffs' First Amendment retaliation claims as interposed against Defendant Suschke below.

In sum, Plaintiffs' claims, to the extent that they seek supervisory liability against Parrey, are not dismissed. However, Plaintiffs' claims against Gonzalez in Counts 3-11, 13, 15, 17 and 19 are dismissed. And, Plaintiffs' claims against Suschke in Counts 1-9 are dismissed.

### iv.   § 1983 LIABILITY BASED ON PERSONAL INVOLVEMENT

For all other Defendants and remaining counts brought under § 1983, Defendants argue that Plaintiffs have failed to sufficiently allege their "personal involvement." Personal

involvement is required to state a claim under § 1983 where, like here, the defendants are sued in their personal capacities. "For a § 1983 claim against a defendant in his or her personal capacity, a plaintiff must show the defendant's direct involvement in a deprivation of the plaintiff's constitutional right." *Santora v. Red Clay Consol. Sch. Dist.*, 580 Fed. App'x 59, 62 (3d Cir. 2014); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Iqbal*, 556 U.S. 662, 676 (2009). As discussed above, personal involvement in the context of supervisory liability is satisfied where a plaintiff alleges the defendant "was 'involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged.'" *Smith v. Grandsen*, 553 Fed. App'x 173, 177 (3d Cir. 2014) (quoting *McKenna v. City of Phila.*, 582 F.3d 447, 460 (3d Cir. 2009)).

Defendant Parrey: As discussed above, with respect to Defendant Parrey, the bulk of Plaintiffs' allegations claim that others acted under his "direction, knowledge, supervision, or ratification." (*See, e.g.*, TCAC ¶¶ 42-44, 47, 48, 51-53, 55, 87, 88, 91, 95, 96). While the Court agrees with Defendants that most of Plaintiffs' allegations are conclusory, the TCAC explicitly alleges that Defendant Parrey "had knowledge of the long-running abuse" and "took no reasonable steps to stop them." (*Id.* ¶ 151). Plaintiffss alleges that Parrey's knowledge of the alleged constitutional violations, including, his alleged personal participation in the violations and knowledge of Forchion's civil complaint and press associated with the same. Therefore, the Court will decline to dismiss the claims against Parrey for failure to allege personal involvement.

Defendant Gonzalez: After stripping away the conclusory allegations setting forth the barebones assertion that certain actions occurred "[u]nder the direction, knowledge, supervision, or ratification" of Defendant Gonzalez (*see, e.g.*, TCAC ¶¶ 43, 44, 46-48, 51-53, 55, 87, 88-91,

95, 96), the TCAC is left with the more specific allegations that "Defendant Gonzalez made false statements in an affidavit by stating that he and other [TPD officers] were dispatched to Mr. Forchion's business in response to reports of disorderly conduct involving a street fight" (*Id.* ¶ 42) and that Gonzalez "conducted a raid of The Joint and The Temple, arrested Mr. Forchion for marijuana, and seized various property belonging to Mr. Forchion" (*Id.* ¶ 52). These more specific allegations, which relate to counts 1 and 2, plausibly assert Defendant Gonzalez's personal involvement in *possible* constitutional violations, and the Court will therefore consider the merits of those counts below. In sum, all claims as interposed against Defendant Gonzalez, except counts 1 and 2, are dismissed.

Defendant Suschke: After repeating the process of stripping away the numerous conclusory allegations that certain actions occurred "[u]nder the direction, knowledge, supervision, or ratification" of Defendant Suschke (*see, e.g.*, TCAC ¶¶ 43, 44, 46-48, 51-53, 55, 87, 88-91, 95, 96), the only individualized allegations against Defendant Suschke are that he told Forchion that the police and prosecutor's office were not pursuing forfeiture of the van and that the van was located at Hawk's Towing (*Id.* ¶ 62); and that Defendant Suschke ordered TPD officers to issue an unfounded summons for violating a curfew that did not apply to the business (*Id.* ¶ 144). The remaining claims against Suschke relate to Suschke's actions as a supervisor and to the acts of his agents. As to the former allegation, the Court does not find that the allegation that "Officer Suschke . . . told Mr. Forchion that the police/the Mercer County Prosecutor were not pursuing forfeiture of the Van and that the Van was located at Hawk's Towing" (*Id.* ¶ 62) "allows the court to draw the reasonable inference that the defendant is liable [any of] the misconduct alleged," *Iqbal*, 556 U.S. at 679. Thus, any claims interposed against Defendant Suschke relating to misconduct in connection with the forfeiture of the van (to the extent any exist) are dismissed.

However, the Court deems the latter allegation, that Defendant Suschke allegedly ordered TPD officers to issue an unfounded summons for violating a curfew, sufficient to permit the Court to engage in analysis of the merits of counts 10 and 11, as interposed against Defendant Suschke. Thus, all counts interposed against Defendant Suschke, aside from counts 10 and 11, are dismissed.

Defendant Ward: Plaintiff alleges that Defendant Ward, a detective for the TPD, participated in the April 27, 2016 raid of the business, and that she used an informant prior to the search warrant execution. (TCAC ¶¶ 11, 52, 112). These barebones allegations against Defendant Ward are insufficient to "allow[ ] the court to draw the reasonable inference that [she] is liable for [any of] the misconduct alleged." *Iqbal*, 556 U.S. at 679. Therefore, all claims against Defendant Ward are dismissed.

Defendant Flowers: As set forth in the factual recitation above, on or about May 10, 2016, Forchion stood outside of The Joint holding a sign that read "We R Open Fuck the Police." (TCAC ¶ 80). Plaintiffs allege that Defendant Flowers attempted to make Forchion stop waving the sign. (*Id.* ¶ 81). Forchion then accused Defendant Flowers of being a pedophile. (*Id.* ¶ 82). The TCAC further alleges that Defendant "Flowers caused charges to be filed against Forchion" and that Flowers decision to "pursu[e] charges against Forchion" and "arrest[ ] him at his business for the same were done in response to Mr. Forchion filing his civil lawsuit against the Trenton police and waving the 'Fuck the Police' sign outside his business and speaking same to police outside his business." (*Id.* ¶ 87). In all, the Court finds these allegations sufficient to show Defendant Flowers' personal involvement with respect to Plaintiff's First Amendment retaliation claims (counts 10-11) and malicious prosecution claim (count 30). However, the allegations do not support a reasonable inference that Defendant Flowers was personally involved in Plaintiffs' substantive due process violations (counts 3-6), procedural due process violations (count 7), or

equal protection violation (counts 8-9). Therefore, those latter counts are dismissed as interposed against Defendant Flowers.

Defendant Miles: Plaintiff alleges that Defendant Miles entered The Joint on September 23, 2016; announced that it was closed; and ordered everyone to leave under threat of arrest, purportedly putting Forchion on notice that The Joint's business license had been revoked. (TCAC ¶ 101). Separately, Plaintiffs also make a conclusory allegation that Defendant Miles knew there was no probable cause to charge Forchion with the several municipal violations discussed in the TCAC. (*Id.* ¶ 190). In short, the Court finds that there is insufficient "personal involvement" and a general lack of plausibility that Defendant Miles is liable for any of the claims of constitutional violations as interposed against him. Accordingly, all claims against Defendant Miles are dismissed.

Defendant Kachmar: Plaintiffs allege that Defendant Kachmar sent notices of The Joint's business license revocation, in a September 19, 2016 letter, to a prior residential address of Forchion, despite knowing the correct address for the business. (*Id.* ¶¶ 96, 98, 100). Defendant Kachmar's decision to revoke the business license was an alleged "mistake" and he reinstated the license on September 26, 2016. (*Id.* at ¶ 103). The Court finds these allegations sufficient to show Defendant Kachmar's personal involvement with respect to the allegations comprising counts 3-6 (substantive due process) and 7 (procedural due process). The merits of these claims are examined below.

**v.  UNLAWFUL SEIZURE (COUNTS 1- 2)**

In counts 1 and 2, Plaintiffs allege an unlawful seizure in violation of the Fourth Amendment, and bring these claim under 42 U.S.C. § 1983 (count 1) and the New Jersey Civil

Rights Act, N.J. Stat. Ann. § 10:6-2 (count 2).[5] The remaining Defendants named in these counts are Defendants Parrey and Gonzalez. Defendants challenge the sufficiency of Plaintiffs' Fourth Amendment unlawful seizure claim.

As discussed *infra*, Plaintiffs allege that on February 28, 2016, Defendants unlawfully removed Forchion and other congregants at The Joint and restricted their movement onceoutside.[6] (TCAC § 125). In particular, Plaintiffs contend that the TPD officers "swarmed the entrance" of The Joint and "seized Plaintiff Forchion and his patrons outside of his business under the guise of enforcing the 11 p.m. curfew that *they knew did not apply to Mr. Forchion's business*." (*Id.* (emphasis in original)). Plaintiffs further allege that after the alleged unlawful seizure, "Defendant Gonzalez made false statements in an affidavit by stating that he and other [TPD] Officers were dispatched to [The Joint] in response to reports of 'disorderly conduct involving a street fight.'" (*Id.*). Plaintiffs challenge the veracity of a police report prepared by Defendants, which "demonstrates the following: (i) the Trenton Police received a call at approximately 2:30AM [on February 28, 2016] indicating that a street fight was taking place in the proximity of [Plaintiffs'] business; (ii) responding officers observed several males fighting; (iii) responding officers observed a crowd of roughly 30 people congregating around the entrance to [Plaintiffs'] business; (iv) upon gaining control of the scene, responding officers learned that Plaintiff's business was open; and (v) responding officers made an arrest at the scene resulting from the fight." (City

---

[5] "The elements of a substantive due process claim under the [New Jersey Civil Rights Act (NJCRA), N.J. Stat. Ann. 10:6-1 to -2] are the same as those under § 1983." *Filgueiras v. Newark Public Sch.*, 45 A.3d 986, 997 (N.J. Super. Ct. App. Div. 2012). The analyses regarding Plaintiffs' claims under the NJCRA are therefore same as those under § 1983. *See id.*

[6] Defendants also argue for dismissal of Plaintiffs' unlawful seizure claims for the seizure of items from Plaintiffs' restaurant. However, neither of the unlawful seizure counts in the TCAC relate to the seizure of these items.

Defendants' Moving Br. at 58 (ECF No. 125-1)). The TPD officers did not obtain a warrant before entering The Joint or ordering the patrons to exit.

A Fourth Amendment search or seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550 U.S. 372, 381 (2007). For a search or seizure to violate the Fourth Amendment, it must be unreasonable. *See Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("seizure alone is not enough for § 1983 liability; the seizure must be 'unreasonable'"). A search or seizure must be objectively analyzed for its reasonableness under the particular circumstances, asking: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

A search or seizure without a warrant can be reasonable if "it falls within a specific exception to the warrant requirement." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). When a plaintiff alleges that he or she has been seized for Fourth Amendment purposes, but where officers have not obtained a warrant, the standard of reasonable suspicion will govern the encounter. *See generally Terry*, 382 U.S. 1. So long as officers have reasonable suspicion that a person is involved in criminal activity based on a "particularized and objective basis," then such a seizure is deemed reasonable for Fourth Amendment purposes. *United States v. Fogle*, 515 F. Supp. 2d 474, 483 (D.N.J. 2007). "[T]he 'reasonable suspicion' inquiry is highly fact-dependent in nature." *Fogle*, 515 F. Supp. 2d at 482 (quoting *United States v. Goodrich,* 450 F.3d 552, 553 (3d Cir.2006)).

Where, as here, a search warrant does not precede a stop or seizure, factors relevant to determining whether officers had such an objective basis, in the context of a tip, include:

> (1) the reputation of the area in which the stop occurred for criminal activity; (2) the time of day; (3) the geographical and temporal

proximity of the stop to the scene of an alleged crime; (4) the number of persons in the area; (5) whether, even if anonymous, the informant(s) communicated by telephone call or in person to officers; (6) the timing, quality, and content of the information communicated by informants; (7) any exigent circumstances at the time; and (8) the behavior of defendant when police came into his vicinity, even if lawful conduct.

*Id.* at 484.  In *Fogle*, the court held that a police officer's *Terry* stop of a vehicle was constitutionally valid where: (1) a person called 911 reporting that a person had a gun in the area; (2) it was 1:53AM; (3) the area had a reputation for being "rough"; (4) information was obtained from a bystander; and (5) the observations of the police when they responded to the 911 call.  *Id.* at 490; *see also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("we conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00AM, and saw [plaintiff] and his two companions walk away as soon as they noticed the police car").

Defendants contend that the February 28, 2016 police report demonstrates the reasonableness of the search and seizure.  However, Plaintiffs refute the veracity of the police report.  Specifically, the TCAC alleges that the officers arrived at The Joint after 11:00 p.m., but before 2:00 a.m., and the officers lacked reasonable suspicion that a crime had been committed. (TCAC ¶¶ 40, 41).  The TCAC further alleges that "Defendant Officers filed false police reports on Forchion regarding, *inter alia*, Forchion operating his business after 11 p.m. (but before 2 a.m.)."  (*Id.* ¶ 43).  For purposes of the instant motion, the Court accepts Plaintiffs' allegations as true.

With regard to the counts 1 and 2 as interposed against <u>Defendant Gonzalez</u>, however, Plaintiffs' claims are vague, conclusory, facially implausible, and must therefore be dismissed. Although the TCAC references a purportedly false statement in an affidavit (*see* TCAC at ¶ 42), Plaintiffs did not attach the affidavit to the TCAC nor did it quote, paraphrase, or describe the

allegedly false statement made by Defendant Gonzalez. Moreover, the TCAC alleges that the false affidavit was executed at some unspecified time "[a]fter the seizure." (*See id.* ¶ 42). Lacking plausibility, the Court dismisses counts 1 and 2 against Defendant Gonzalez for failure to state a claim upon which relief can be granted.

However, the Court will not dismiss counts 1 and 2 in their entirety. Accepting Plaintiffs' allegations as true, Plaintiffs adequately state a claim by, *inter alia*, alleging that TPD officers "seized Plaintiff Forchion and his patrons outside of his business under the guise of enforcing the 11 p.m. curfew that *they knew did not apply to Mr. Forchion's business.*" (TCAC ¶¶ 125, 127) (emphasis in original). Conducting a search and seizure without a reasonable, articulable suspicion clearly infringes upon Plaintiffs' constitutional rights. Accordingly, Plaintiffs will be able to proceed with counts 1 and 2 as interposed against <u>Defendant Parrey</u>, particularly in view of the fact that Plaintiffs allege that Defendant Parrey "had knowledge of . . . [certain] long-running abuse [against Plaintiffs]. . . and took no reasonable steps to stop [it]." (*Id.* ¶ 151).

Moreover, the Court finds that Defendant Parrey is not entitled to qualified immunity with respect to counts 1 and 2 at this time. The Court observes that "a decision on qualified immunity will be premature when there are unresolved disputed of historical fact relevant to the immunity analysis." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). Here, although the February 28, 2016 police report indicates there are facts that may give rise to the existence of probable cause and/or reasonable suspicion, the Court is constrained to accept the TCAC's allegation that the report was fabricated. Given these disputed facts, the Court finds that Defendant Parrey is not entitled to qualified immunity at this time, and counts 1 and 2 are not dismissed as interposed against him.

vi. **SUBSTANTIVE DUE PROCESS** (COUNTS 3-6)

Plaintiffs allege that "Defendants have used their governmental offices to further an illegal conspiracy to destroy Plaintiffs' constitutional rights to conduct a legitimate business" and "to freedom of contract." (TCAC ¶¶ 129, 131, 133, 135). In particular, "[b]y curtailing lawful business hours, chasing away customers, and ultimately stripping Mr. Forchion and The Joint of their business license," Plaintiffs allege that "Defendants removed or significantly altered [Plaintiffs'] liberty and property interests in their business" and "to freely contract with customers during the hours of 11 p.m. to 2 a.m." (*Id.*)

As mentioned above, "[s]ection 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman.*, 422 F.3d at 146. "The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law. . . . " *Wrench Transportation Sys., Inc. v. Bradley*, 340 F. App'x 812, 815 (3d Cir. 2009) (citation omitted). "Substantive due process is a 'component of the [Fourteenth Amendment] that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Id.* (citation omitted).

"The history of substantive due process 'counsels caution and restraint.'" *Nicholas v. Pa. State. Univ.*, 227 F.3d 133, 140 (3d Cir. 2000) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring)). "Substantive due process is a doctrine reserved for egregious official conduct that trenches upon the most fundamental of civil liberties." *Armbruster v. Cavanaugh*, 410 Fed. App'x 564, 565 (3d Cir. 2011). Generally, there has been reluctance "to expand the concept of substantive due process because guideposts for responsible decisionmaking

in this uncharted area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).

Moreover, an executive, governmental action does not violate substantive due process when merely motivated by an "improper motive"; rather, it must rise to the higher level of "shock[ing] the conscience." *County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 170 (3d Cir. 2006) (modification in original). "The 'shocks the conscience' test is 'not precise,' but it is a high bar—'[w]hat shocks the conscience is only the most egregious official conduct.'" *Strategic Envtl. Partners, LLC v. Bucco*, 184 F. Supp. 3d 108, 129 (D.N.J. 2016) (citation omitted). Conduct that could be considered to "shock the conscience" includes, but is not limited to, "corruption, self-dealing, ethnic bias, or interference with an otherwise protected constitutionally protected activity." *Id.*

Here, counts 3-6 do not plausibly state a claim for an infringement upon a fundamental right in violation of the doctrine of substantive due process. *First*, in counts 3 and 4, Plaintiffs allege a substantive due process violation based upon their purported "right[ ] to conduct a legitimate business." The Third Circuit has held that the "right to engage in business" is not a fundamental right entitled to substantive due process protection. *See Wrench*, 340 Fed. App'x at 815. Since this is not fundamental right protected by the doctrine of substantive due process (*see id.*), these counts must be dismissed. *Second*, the Court agrees with Defendants that Plaintiffs' allegations in counts 3-6 are vague and conclusory, and, in any event, do not rise to level of "shocking the conscience." In particular, Plaintiffs' unsupported allegations that Defendants' actions "curtail[ed] lawful business hours, chas[ed] away customers, and ultimately strip[ed] Mr. Forchion and The Joint of their business license" (TCAC ¶¶ 129, 131, 133, 135) lack facial plausibility in that Plaintiffs fail to identify any *specific*, identifiable, or discrete government

action(s) that specifically support a bases for this claim, let alone a government action that was sufficiently egregious to meet the "shock the conscience" standard. For these reasons, counts 3-6 are dismissed.

### vii. EQUAL PROTECTION (COUNTS 8-9)

Plaintiffs assert equal protection claims (counts 8-9) on a "class of one theory." *See* Pl. Opp. Br. at 34 (ECF No. 132)). In other words, Plaintiffs do not allege that they were treated differently based on a protected classification (*e.g.*, race, alienage, or national origin), but, rather, were treated differently than others similarly situated. In this case, Plaintiffs allege that Defendants selectively enforced the Ordinance against Plaintiffs while allowing purportedly similar businesses—Taco Bell and Domino's Pizza—to operate well after the 11:00 p.m. curfew imposed by the Ordinance. (TCAC ¶¶ 139, 141).

"The Fourteenth Amendment's Equal Protection Clause admonishes that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (quoting U.S. Const. amend XIV, § 1). Under a "class of one" equal protection claim, a plaintiff must demonstrate that: "1) it 'has been intentionally treated differently from others similarly situated,' and 2) 'there is no rational basis for the difference in treatment.'" *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 Fed. App'x 251, 259 (3d Cir. 2010) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). "At the motion to dismiss stage," Plaintiffs "must allege facts sufficient to make plausible the existence of such similarly situated parties." *Perano v. Twp. Of Tilden*, 423 Fed. App'x 234, 238 (3d Cir. 2011). As to the second prong, "[r]ational basis review is a very deferential standard." *Newark Cab*, 901 F.3d at 156 (quoting *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007)); *see also*

*Highway Materials*, 386 F. App'x at 259 ("The second prong in particular imposes a high burden, requiring 'different treatment [that] is 'irrational and wholly arbitrary.'") (citation omitted)).

Plaintiffs' class of one equal protection claims (counts 8-9) fail. Most fatally, Plaintiffs fail to plausibly demonstrate that Taco Bell and Domino's Pizza were similarly situated to The Joint. Plaintiffs merely allege that Taco Bell and Domino's Pizza were "other business in non-residential zones" that "were allowed to operate well after the 11:00 p.m. business curfew." (TCAC ¶¶ 45, 139, 141). These barebones allegations do not permit the Court to reasonably infer that Taco Bell and Domino's Pizza were necessarily "similarly situated" to The Joint. In particular, from the pleadings, the Court cannot discern, *inter alia*, whether Taco Bell and Domino's Pizza were ever charged with violating the Ordinance, and, if so, under what circumstances. Moreover, Plaintiffs fail to adequately demonstrate that the enforcement of the Ordinance against The Joint, as compared to Taco Bell and Domino's Pizza, was irrational or wholly arbitrary. *Highway Materials*, 386 F. App'x at 259. For these reasons, counts 8-9 are dismissed.

**viii.**   **FIRST AMENDMENT RETALIATION (COUNTS 10-11)**

Plaintiffs allege that Defendants took "a number of retaliatory actions against Mr. Forchion" in response to: (1) Forchion's civil lawsuit against named Defendants; (2) Forchion's protests outside of The Joint; and (3) his weekly newspaper column criticizing local law enforcement. (TCAC §§ 143-45, 147-49; Pl. Opp. Br. at 41-43). The alleged "retaliatory actions" include: (1) TPD officers selectively stopping The Joint's customers and instructing them not to patronize the business; (2) TPD officers contacting neighboring businesses and instructing them not to allow The Joint's customers to park in their respective lots; (3) TPD officers parking marked patrol cars at or near The Joint to deter patronage; (4) Defendants issuing multiple citations for violating the Ordinance; (5) Defendant Suschke ordering TPD to issue Forchion "unfounded"

summonses for violating the Ordinance; (6) seizing Forchion's van and delivery car and permitting the vehicles to be held without notice; (7) revoking The Joint's business license; (8) charging Forchion with witness tampering; and (9) Defendant Wilson's prosecution of the municipal ordinance violations without probable cause. (*Id.* §§ 144, 148).

To successfully allege a § 1983 claim for retaliation in violation of the First Amendment, Plaintiff must plausibly allege that "1) [they] engaged in activity protected by the First Amendment; 2) [Defendants] took retaliatory action against [Plaintiffs] 'sufficient to deter a person of ordinary firmness from exercising his or her rights'; and 3) a causal nexus existed between the protected activity and the retaliation." *Rink v. Ne. Educ. Intermediate Unit 19*, 717 Fed. App'x 126, 133 (3d Cir. 2017) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

To put a finer point on the second element, as Plaintiffs' point out (Pl. Opp. Br. at 47-48), the retaliatory acts alleged must be sufficient to "deter a person of ordinary firmness from exercising his or her First Amendment rights"; the test is not "whether Defendant['s] . . . [actions] actually deterred Plaintiffs from speaking." *Citizens for a Better Lawnside, Inc. v. Bryant*, No. 05-4286 (RBK), 2007 WL 1557479, at *6 (D.N.J. May 24, 2007); *see also Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). With respect to the third element, a "causal nexus" exists where "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W.*, 480 F.3d at 267. The second and third prongs of the test pose questions of fact, rather than of law. *See Thomas*, 463 F.3d at 296; *Fredericks v. Twp. of Weehawken*, No. 2:11-05363 (WJM), 2012 WL 5628196, at *7 (D.N.J. Nov. 15, 2012). In addition, the Supreme Court has recently held the "plaintiff pressing a retaliatory arrest claim must plead and prove the

absence of probable cause for the arrest." *Nieves v. Partlett*, ___ U.S. ___, 139 S. Ct. 1715, 1724 (2019).

For the following three reasons, Defendants frame their conduct as *non*-retaliatory: (1) the conduct complained of did not actually stop Forchion from expressing his First Amendment rights; (2) Plaintiffs' claims are solely predicated on the operation of *respondeat superior*; and (3) Plaintiffs fail to establish the required but-for causal connection necessary to sustain its claims as a matter of law. (*See* City Defendants' Moving Br. at 63). The Court dispenses with the Defendants' first and second arguments with relative ease. *First*, as the Court has stated, the test is not actual deterrence, it is whether a "person of ordinary firmness" would be deterred from speaking. *Thomas*, 463 F.3d at 296. *Second*, unlike many other counts in the TCAC, Plaintiffs do not only name Defendants in their supervisory role, but also specify some personal involvement. (*See, e.g.*, TCAC ¶ 148). For these reasons, among others, the Court will further analyze the merits of the alleged retaliation in response to Plaintiffs: (1) authoring a newspaper column criticizing local law enforcement; (2) initiating a civil suits; and (3) protesting outside of The Joint.

## A. RETALIATION IN CONNECTION WITH THE NEWSPAPER COLUMN

Plaintiffs argue that Forchion's sporadic authoring of a newspaper column criticizing local law enforcement (*i.e.*, the TPD) was protected conduct in which subjected him to unlawful retaliation. However, Plaintiffs failed to re-plead this allegation in the TCAC. As a result, the Court will not consider Forchion's journalistic conduct as it relates to his First Amendment rights.[7]

---

[7] "[T]he amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.'" *New Rock Asset Partners, LP v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d Cir. 1996) (quoting *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)).

## B. RETALIATION IN CONNECTION WITH PLAINTIFFS' LAWSUIT

On March 9, 2016, Forchion filed a civil lawsuit against the TPD. Essentially, Plaintiff argues that law enforcement retaliated against him in response to the lawsuit, and that by filing suit, he ignited the spite of law enforcement.

Indeed, bringing a civil action constitutes First Amendment protected activity. "The Supreme Court has consistently held that an individual's constitutional right of access to court is protected by the First Amendment's clause granting the right to petition the government for grievances." *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) (citing *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). Here, Plaintiffs set forth a series of allegations purportedly demonstrating that they were targeted by law enforcement in retaliation for petitioning the court for redress. (*See* Pl. Opp. Br. at 43-46). The Court finds Plaintiffs' allegations sufficient to satisfy the first element of the claim with regard to the filing of his civil complaints.

However, the TCAC does not adequately allege a causal connection between his civil complaint and the alleged retaliatory conduct. Specifically, Plaintiffs claim that "[a]s a result of the filing of this lawsuit . . . even more police harassment was perpetuated on Mr. Forchion and his business patrons." (TCAC ¶ 51). Other than the conclusory "[a]s a result" language, there is no indication that Defendants' actions were in fact caused by the filing of any civil action. Defendants took actions against Forchion both prior to and after he filed this action. Therefore, his First Amendment retaliation claim with respect to the civil complaints fails.

## C. RETALIATION IN CONNECTION WITH THE MAY 10, 2016 PROTEST

Of particular interest to the Court, though, is Plaintiff's off-hand arrest for cyber bullying—to which charges were later dropped—because it presents as the straw that broke the camel's back,

sequentially speaking. On or about May 10, 2016, Plaintiff's frustrations boiled over, relative to the above-outlined factual sequence, and Forchion stood outside The Joint holding a sign which read: "We R Open Fuck the Police," even going so far as shouting, "Fuck the police," at police cruisers stationed nearby. (*Id.* ¶ 80). Officer Flowers then attempted to silence Forchion, which Forchion rebutted by calling the officer a pedophile. (*Id.* ¶¶ 81-82). Flowers then arrested Forchion for the later-dropped charge of cyber bullying. (*Id.* ¶¶ 85-87).

In analyzing the three elements of the claim, the Court first begins with Forchion's allegedly protected speech. Plaintiffs allege that the statement, "Fuck the police," although vulgar, was a First Amendment protected activity. The Court agrees. *See Cohen v. California*, 403 U.S. 15 (1971); *Spier v. Elaesser*, 267 F. Supp. 2d 806, 809-11 (S.D. Ohio 2003). Second, Plaintiffs have sufficiently alleged a retaliatory action against Forchion—namely, that he was placed under arrest. (TCAC ¶¶ 85-86). And third, although the Court recognizes that the intervening event of calling Defendant Flowers a pedophile may have been the cause of the arrest (*see id.* ¶ 82), it is equally plausible that Forchion was arrested for holding a sign and shouting vulgarities about the police (*see id.* ¶ 87).

However, although the TCAC alleges that Forchion did not post a recording of his exchange with Defendant Flowers on social media, there is no allegation that Defendant Flowers lacked probable cause to arrest him for cyber harassment. *See Nieves*, 139 S. Ct. at 1724 (A "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."). Counts 10 and 11 are dismissed for the reasons stated in this section.

### ix. PROCEDURAL DUE PROCESS (COUNTS 7, 13-14, 17-18)

Plaintiffs allege procedural due process violations in connection with the revocation of The Joint's business license (count 7), the seizure of Forchion's van (counts 13-14), and, separately, the seizure of Forchion's delivery car (counts 17-18).

In count 7, Plaintiffs allege that Defendants revoked The Joint's business license without notice or a hearing, and purportedly used "sham violations" of the Ordinance as support for revocation. (TCAC ¶ 137).

In count 13, Plaintiffs allege that: (1) Defendants seized, or caused their agents to seize, Forchion's van without notice or a hearing; (2) Defendants deliberately failed to notify Forchion that the van was to be deemed abandoned; (3) Defendants caused title in the van to vest in the City of Trenton without forfeiture proceedings; and (4) Defendants caused title in the Van to transfer to Hawk's Towing so that the Van could be destroyed. (TCAC ¶ 153).

In count 14, Plaintiffs allege that Defendant Haumann: (1) failed to notify, and failed to cause his agents to notify, Plaintiffs that forfeiture proceedings would not be taken against the van; (2) failed to notify that Plaintiff's van was to be deemed abandoned; and (3) as a direct result, the van was destroyed at Hawk's Towing. (*Id.* ¶ 155).

In count 17, Plaintiffs allege that the Defendants seized, or caused their agents to seize, the delivery car without notice or a hearing. (*Id.* ¶ 161).

In count 18, Plaintiffs allege that (1) failed to notify, and failed to cause his agents to notify, Plaintiffs that forfeiture proceedings would not be taken against the delivery car; and (2) as a direct result, the the delivery car remained in Mercer County's custody for approximately two years. (*Id.* ¶ 163).

To allege a procedural due process violation, a "plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). But, "[w]hen access to [the] procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim." *Alvin*, 227 F.3d at 118. "Where practicable, due process generally requires notice and a hearing in advance of a deprivation of liberty." *Hickox v. Christie*, 205 F. Supp. 3d 579, 601 (D.N.J. 2016). Due process, however, "is flexible and calls for such procedural protections as the particular situation demands." *Id.*

## A. SEIZURE OF THE VAN AND DELIVERY CAR (COUNTS 13-14, 17-18)

N.J.S.A § 2C:64-1b is the relevant statute that governs forfeiture procedures in New Jersey. It makes clear that "*prima facie* contraband and property posing an immediate threat to public health, safety or welfare can be seized without process, and that all other property subject to forfeiture may be seized as evidence for a criminal prosecution or by process issued by any court of competent jurisdiction." *Dragutsky v. Tate*, 620 A.2d 1065, 1066 (App. Div. 1993). However, seizure "is not the end of the story. It is not equivalent to forfeiture." *Id.* Forfeiture of non-*prima facie* contraband requires the State to initiate a civil action within ninety days of the seizure. N.J.S.A. § 2C:64–3a; *Dragutsky*, 620 A.2d at 1066. All persons known to have an interest in the property must be given notice of the action and an opportunity to reply and have a hearing. N.J.S.A. § 2C:64–3a-e.

It is clear that though the State is not required to seek forfeiture of every piece of seized property, failure to seek forfeiture "deprives the State of its right to *retain*" the property. *Dragutsky*, 620 A.2d at 1066-67 (emphasis supplied). The State has no right to retain seized property without initiating a forfeiture action and should instead return it to its known owners.

Moreover, the U.S. Supreme Court has consistently held that the fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner before being finally deprived of a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In the context of seizure and forfeiture, New Jersey courts have recognized that the obligation to conduct forfeiture proceedings "in conformity with time requirements is of constitutional dimension," *State v. Cavassa*, 549 A.2d 458, 461 (App. Div. 1988), and that an unjustified delay in bringing forfeiture proceedings results in "the deprivation of property during the intervening period [which] constitutes a denial of due process," *State v. One Ford Van Econoline*, 381 A.2d 387, 392 (App. Div. 1985).

i. ALLEGATIONS RELATING TO THE VAN (COUNTS 13-14)

Forchion has a cause of action under § 1983 if he was deprived of property through state action without due process of law. Here, the Court construes the deprivation Forchion challenges as not the seizure of the van, but the choice to retain it without following the statutorily required forfeiture procedures.

The Court first finds that without notifying the owner and returning property when the decision is made not to pursue forfeiture, the requirement of a forfeiture proceeding is rendered meaningless because an individual is effectively deprived of his property. Thus, Defendants' argument that Forchion had notice of "potential" proceedings but that "the van was simply not sought to be returned through a forfeiture proceeding" (City Defendants' Reply Br. at 48 (ECF

No. 135) ignores the critical, "essential and expected step in the proceedings," the initiation of a civil forfeiture action. *Dragutsky*, 620 A.2d at 1067. The filing of a forfeiture action would have set in motion Forchion's obligations to file an answer and appear for a hearing to reclaim his van. N.J.S.A. § 2C:64–3a-e. Without such a filing, the proper procedural channel to reclaim his van was not available to Forchion, and he was deprived of his property without a hearing. More troubling still is the allegation that the van was allegedly crushed one week before the scheduled hearing. (TCAC ¶¶ 62, 65). Thus, for these reasons, Defendants' motion to dismiss count 13 is denied as interposed against remaining Defendants Parrey.

Moreover, with respect to count 14, Defendant Haumann is not entitled to qualified immunity at this time because the allegation that his delay in returning the van resulted in its destruction negates any argument that his conduct was reasonable. *See Reitz*, 125 F.3d at 147. Accepting the allegations in the TCAC as true, Defendant Haumann was personally responsible for seized property and owner notification. (TCAC ¶ 70). In fact, his signature is on the forfeiture complaint that was initiated against the sum of money seized from Forchion. (*See* City Defendants' Moving Br., Ex. 23). The right to return of seized property without delay when forfeiture proceedings are not instituted within the statutory time frame is of "constitutional dimension" and has been clearly established in New Jersey since at least the 1980s. *Cavassa*, 549 A.2d at 461. Any reasonable prosecutor should have known he was violating Forchion's constitutional rights when he made the decision to retain Forchion's van without the statutorily required process. Accordingly, Defendants' motion to dismiss count 14 is also denied.

ii.   ALLEGATIONS RELATING TO THE DELIVERY CAR (COUNTS 17-18)

In counts 17 and 18, Plaintiff also alleges that Defendants seized, or caused their agents to seize, the delivery car without notice or a hearing. Forchion challenges not the seizure of the delivery car, but the decision to retain it for two years without initiating forfeiture procedures. Again, without Defendant Haumann initiating of a forfeiture claim, the proper procedural channel to reclaim his car was not available to Forchion, and he was deprived of his property without a hearing. N.J.S.A. § 2C:64–3a-e. Defendant Haumann is not entitled to qualified immunity for this delay as a matter of law because, as in *Reitz*, the allegation that he delayed returning the delivery car for two years creates a genuine issue of material fact concerning the reasonableness of his conduct. 125 F.3d at 147. Any reasonable prosecutor should have known he was violating Forchion's constitutional rights when he made the decision to retain Forchion's delivery car without the statutorily required process. For these reasons, Defendants' motion to dismiss counts 17, as interposed against remaining Defendants Parrey, and count 18, are denied.

## B.   THE REVOCATION OF THE JOINT'S BUSINESS LICENSE (COUNT 7)

Plaintiffs allege that Defendants revoked The Joint's business license, using the "sham" violations of the Ordinance as support. (*See* TCAC ¶¶ 90-104). Plaintiffs further allege that "[t]o accomplish their scheme" of revoking the license "without giving Mr. Forchion a chance to fight back," Defendants "agreed to send and did send Mr. Forchion's legal Notice of the Hearing on the Revocation of the Joint's business license to Mr. Forchion's old residential address, despite the fact that the business address on the business license of The Joint is 322 East State Street." (*Id.* ¶ 95). By allegedly intentionally sending the "Notice of Hearing" to the wrong address, Plaintiffs allege that The Joint's business license was later revoked without notice and without opportunity to be heard. (*Id.* ¶¶ 96, 102).

More specifically, Plaintiffs allege that according to a September 19, 2016 letter from Defendant Kachmar, The Joint's business license was to be revoked effective September 21, 2016 for several violations of the Ordinance. (*Id.* ¶ 101). Plaintiffs never received that letter and only found out about the revocation on September 23, 2016 when Defendant Miles allegedly went to The Joint and announced that the business was closed and ordered everyone out. (*Id.* ¶ 102). On September 26, 2016, Mr. Forchion appealed the revocation and Defendant Kachmar reinstated The Joint's business license, allegedly remarking that he had "made a mistake." (*Id.* ¶ 103). As a result of Defendants' actions, Plaintiffs allege that customers stopped patronizing The Joint, and Plaintiffs suffered "significant financial losses." (*Id.* ¶ 104).

The Court does not find that Defendants' accidental revocation of The Joint's business license violated due process. *First*, Plaintiffs fail to allege plausible facts that demonstrate Defendants' actually colluded to intentionally mail the Notice of Hearing to the wrong address. Rather, Plaintiffs' allegations in this respect are entirely conclusory. (*See id.* ¶ 96). *Second*, conspicuously missing from the TCAC are any allegations that Plaintiffs stopped, or were otherwise prevented from, operating The Joint during the brief window in which the business license may have technically been revoked. Thus, the Court cannot conclude, based upon the pleadings, that Plaintiffs were, in fact, "deprived . . . of [their] right to conduct business." (*Id.* ¶ 99). For these reasons, count 7 is dismissed.

**x.    MALICIOUS PROSECUTION (COUNT 30)**

In count 30, Plaintiffs allege that Defendants knew there was no legitimate probable cause to charge Forchion with thirteen violations of the Ordinance, with the ten other municipal violations, nor with witness tampering, but maliciously prosecuted him anyway. (*Id.* ¶¶ 190-91). The alleged purpose of initiating these proceedings was to "harass and intimidate Mr. Forchion,

"silence his voice, in the community, strip him of his business license, shut down his business, attempt to publicly embarrass him, and later to retaliate against him for filing lawsuits." (*See id.* ¶ 191). All of the charges were dismissed, acquitted, or otherwise resolved in Forchion's favor. (*See id.* ¶¶ 190-91). As a result of Defendants' purported malicious prosecution, Plaintiffs allege that "Mr. Forchion was deprived of significant liberty interests: he was forced to spend over 400 days in jail for the witness tampering charge, which prevented him from operating his business, lost his business license as a result of being jailed and unable to operate his business, and lost his business," as well as lost his van and had his delivery car "held hostage" for two years. (*Id.*).

The elements of malicious prosecution are set forth in *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003):

> [A] plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) *the plaintiff suffered deprivation of liberty* consistent with the concept of seizure as a consequence of a legal proceeding.

*Id.* at 521 (emphasis supplied); *Black v. Montgomery Cnty.*, 835 F.3d 358, 367-68 (3d Cir. 2016). The Third Circuit has recognized the "deprivation of liberty" as a critical element of a § 1983 malicious prosecution claim. Given the circumstances at bar, the Court, in its discretion, will analyze that component of the claim first.

## A. DEPRIVATION OF LIBERTY ANALYSIS

As described above, Plaintiffs allege that Forchion suffered a deprivation of liberty in several ways, specifically, that he lost his business license, business, iconic van; his delivery car was withheld form him for two years; and he spent more than 400 days in jail for the witness tampering charge. (TCAC ¶¶ 190-91). Plaintiffs attribute these alleged deprivations of liberty to the malicious prosecutions of the municipal violations and witness tampering charge. (*Id*). As a

result, Plaintiffs allege that "Mr. Forchion's Fourth Amendment Rights were grossly and repeatedly violated." (*Id.* ¶ 192).

The requirement that a plaintiff must allege a deprivation of liberty in order to sustain a claim for malicious prosecution was effectively added by the Supreme Court in *Albright v. Oliver*, 510 U.S. 266 (1994). *See Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)). In order to satisfy the post-*Albright* deprivation of liberty requirement in the Fourth Amendment malicious prosecution context, the Court must determine whether Plaintiffs' alleged deprivations of liberty, as outlined above, demonstrate a Fourth Amendment "seizure.". *Gallo*, 161 F.3d at 222 ("[A] plaintiff asserting a malicious prosecution claim must show 'some deprivation of liberty consistent with the concept of 'seizure.'") (citation omitted)).

In *Gallo*, the Third Circuit held that a $10,000 bond, travel restrictions outside of New Jersey and Pennsylvania, mandatory weekly contact with pretrial services, and mandatory court proceedings, including trial and arraignment, constituted a "seizure." *Id.* at 222-25. Similarly, in *Black*, the Third Circuit held that a plaintiff who was required to fly from her home in California to attend an arraignment and other pre-trial hearings related to an arson charge, post $50,000 in unsecured bail, and had a "cloud of very serious charges" demonstrated that she had been "seized" by the state. 835 F.3d at 367-68. The *Black* court effectively stated that, post-*Albright*, all "[p]re-trial restrictions of liberty aimed at securing a suspect's court attendance are . . . 'seizures' . . . [because] the difference between detention in jail, release on bond, and release subject to compliance with other conditions is in the <u>degree</u> of restriction on the individual's liberty, not in the <u>kind</u> of restriction." *Id.* at 367 (citation omitted).

On the other end of the spectrum, the Third Circuit held in *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d. Cir. 2005), that a plaintiff who was only issued a summons as a result of legal proceedings did not suffer a "seizure." The court reasoned that because the plaintiffs in that case were never arrested, never posted bail, and were free to travel, *inter alia*, the plaintiff did not suffer a deprivation of liberty severe enough to constitute a Fourth Amenedment "seizure." *Id.*

Courts in this circuit have hewn closely to the established precedents set by *Gallo* and *Black* in recognizing that a "seizure" generally relates to securing appearance in court (*e.g.*,, actual detention, posting of bonds, and restriction from travel) and have generally declined to expand the concept further. For example, in *Lear v. Zanic*, 524 Fed.Appx. 797, 799-800 (3d Cir. 2013), the Third Circuit declined to recognize a "seizure" where a police officer was placed on restricted duty as a result of alleged malicious prosecution. The court held that our jurisprudence did not support deeming the alleged "employment related restrictions" as "seizures," but rather focused on whether there was "actual detention, posting of bonds, and restriction from travel." *Id.* at 800.

Here, the only deprivation of liberty which Plaintiffs allege that would suffice as a "seizure" under Third Circuit jurisprudence is the time that Plaintiff spent in jail (more than 400 days), since it is the only alleged deprivation of liberty concerning securing Forchion's appearance in court and actual detention. This potential "seizure" resulted from the witness tampering charge. Accordingly, it does not extend to the allegations relating to the prosecution of the municipal violations. *See Curry v. Yachera*, 835 F.3d 373, 380 (3d Cir. 2016) (holding that time spent in jail for one crime cannot also satisfy the deprivation of liberty prong for another under a § 1983 malicious prosecution claim). Therefore, Plaintiffs' never suffered a seizure with respect to the municipal violations.

Moreover, regarding the loss of Plaintiffs' business license, Plaintiffs allege that Defendants agreed to use the municipal business-hour violations in order to shut down his business, and proceeded to revoke his license based on these violations. (TCAC ¶¶ 90-91). Plaintiffs, however, do not allege that the license was revoked as a means to secure his appearance in court, nor does it appear that way. Similarly, Plaintiffs failed to allege that the seizure of Forchion's van and delivery car were, in any way, a means of securing his appearance in court, either, and it appears that it was more connected to the raid than to the pending municipal violations or witness tampering charge. It stands, therefore, that the deprivations of liberty which Plaintiffs attribute to the municipal violations do not count as Fourth Amendment "seizures" in the context of a § 1983 malicious prosecution claim.

This leaves only the time spent in jail as a deprivation of liberty significant enough to constitute a "seizure." And, as mentioned above, Forchion's time spent in custody relates only to Plaintiffs' claims that Defendants knew there was no probable cause to charge Plaintiff with witness tampering, that Defendant Onofri knew there was no probable cause to present the witness tampering charges to a grand jury, and that Defendants Katz and Boyle knew there was no probable cause to prosecute the charge, for which Plaintiff was eventually acquitted. (TCAC ¶¶ 190-91). Having determined that Plaintiffs have sufficiently pled the fifth element, or, a deprivation of liberty, with respect to the witness tampering charge, the Court will now analyze whether the other four elements of a *prima facie* claim for malicious prosecution have been plausibly asserted.

### B. THE WITNESS TAMPERING PROSECUTION; REMAINING ELEMENTS TO STATE A CLAIM

To state a claim for malicious prosecution in connection with the witness tampering charges, Plaintiffs must successfully plead the four other elements of the claim, as listed above, including: (1) that Defendants initiated a criminal proceeding; (2) the criminal proceeding ended

in Plaintiffs' favor; (3) the proceeding was initiated without probable cause; and (4) Defendants acted maliciously or for a purpose other than bringing the plaintiff to justice. *Marasco*, 318 F.3d at 521.

Defendants do not contest the first element, which Plaintiff satisfied by alleging that he was arrested and charged with two counts of witness tampering. (TCAC ¶ 114). It is equally clear that Plaintiffs have satisfied the fourth element by alleging that he was acquitted of the witness tampering charges by a jury. (*Id.* ¶ 116). Plaintiffs' success ends there, however, as the Court finds that the second element—or, lack of probable cause—has not been adequately pled.

In a § 1983 malicious prosecution claim, "a grand jury indictment or presentment constitutes *prima facie* evidence of probable cause to prosecute." *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989). This *prima facie* evidence, however, may be rebutted by evidence of fraud, perjury, or corrupt means used to procure the presentment. *Id.* In *Rose*, the Third Circuit affirmed dismissal of a plaintiff's § 1983 malicious prosecution claim, despite the fact that the plaintiff alleged that the defendants committed perjury in connection with the grand jury indictment. *Id.* at 353-354. The court found that the plaintiff failed to allege any specific instances of witnesses perjuring themselves or any substantive perjured testimony, thus failing to successfully rebut the *prima facie* evidence of probable cause established by the indictment. *Id.* The court concluded that "absent more specific allegations as to who lied at the grand jury proceedings and what they lied about, or, alternatively, as to what portions of the presentment were falsified, we are unable to conclude that the plaintiff's allegations that the presentment was procured through fraud or perjury are sufficiently specific." *Id.* at 354.

Here, Plaintiffs' claim fails on the same grounds. Plaintiffs fail to allege any specific instances of fraud, perjury, or corrupt means to procure the grand jury indictment for the witness

tampering charges. Instead, Plaintiffs merely assert the wholly conclusory allegation that Defendants knew there was no probable cause to charge, present for indictment, and prosecute him for witness tampering. (TCAC ¶¶ 117-20).

Moreover, while Plaintiffs do allege that the purpose of the witness tampering charges and prosecution were to silence his voice and close his business, the Court does not find that the allegations rise to the level of plausibly asserting corruption or fraud in the grand jury presentment. Here, as in *Rose*, Plaintiffs make no specific allegations regarding attempted perjury, falsified evidence, or anything of that nature. To the contrary, Plaintiffs aver that Forchion contacted the household of a known informant, thus spurring the charge and indictment. (*Id.* ¶ 114). Accordingly, Plaintiffs have failed to plead lack of probable cause element, particularly in view of the grand jury indictment which has not been rebutted with "evidence that the presentment was procured by fraud, perjury or other corrupt means." *Rose*, 871 F.2d at 353.

### xi. TORT CLAIMS (COUNTS 15-16, 19-29)

#### A. PLAINTIFFS' TORT CLAIMS AGAINST PUBLIC EMPLOYEES (COUNTS 15-16, 19-20)

Counts 15, 16, 19, and 20 allege causes of action for gross negligence as interposed against Defendants Parrey, Gonzalez, Ward, and Haumann. Counts 15 and 16 alleges that Defendants Parrey, Gonzalez, Ward, and Haumann "willfully disregarded Mr. Forchion's ownership interest in his Van and permitted said Van to be crushed." (TCAC §§ 157, 159). Counts 19 and 20 allege that Defendant Parrey, Gonzalez, Ward, and Haumann "willfully disregarded Mr. Forchion's ownership interest in his Delivery Car and permitted said Delivery Car to be held in Mercer County's custody for approximately two years." (*Id.* §§ 165, 167). Defendants argue that these gross negligence claims must be dismissed pursuant to The New Jersey Tort Claims Act. (City Defendants' Moving Br. at 86-88). The Court agrees.

"The New Jersey Tort Claims Act provides . . . that no action shall be brought against a public entity unless the claim upon which it is based shall have been presented in accordance with the procedure set forth." *Estate of McGrath by McGrath v. N. Jersey Dist. Water Supply Comm'n*, 224 N.J. Super. 563, 570-71 (Law Div. 1986) (citing N.J.S.A. § 59:8-3). Pursuant to the New Jersey Tort Claims Act ("NJTCA"):

> The claimant shall be forever parred from recovering against a public entity or public employee if:
>
> a. The claimant failed to file the claim with the public entity within 90 days of accrual of the claim except as otherwise provided in N.J.S. 59:8-9; or
>
> b. Two years have elapsed since the accrual of the claim; or
>
> c. The claimant or the claimant's authorized representative entered into a settlement agreement with respect to the claim.

N.J. Stat. Ann. § 59:8-8. The ninety-day notice period may be extended by a court upon a finding of "sufficient reasons constituting extraordinary circumstances for [the plaintiff's] failure to file notice of claim within the period of time prescribed," but only if the plaintiff files a late notice "within one year after the accrual of his claim[.]" N.J.S.A. § 59:8–9; *see Slater v. Hardin*, No. L–8574–09, 2014 WL 923337, at *5 (N.J. Sup. Ct. App. Div. Mar. 11, 2014). Plaintiffs who do not comply with this requirement are "forever barred" from recovering on their claim. *See* N.J.S.A. § 59:8–8. Notice is important because it provides state agencies the "opportunity to investigate the claims, and take disciplinary or other appropriate action to rectify inappropriate behavior or flawed practices[.]" *Mawhinney v. Francesco*, No. 08–3317, 2010 WL 2557713, at *9 (D.N.J. June 22, 2010) (citation omitted).

Here, Plaintiffs fail to allege compliance with the ninety-day notice requirement, and do not otherwise allege that they are entitled to the extension of time to file notice of their claims as contemplated in N.J.S.A. § 59:8–9. Specifically, the TCAC is devoid of any allegations that

Plaintiffs filed or provided notice of their gross negligence claims within ninety days after accrual of these causes of action. Conceding this pleading deficiency, Plaintiffs contend that they are entitled to discovery on this issue. The Court is not persuaded. Indeed, this Court has held that "[f]ailure to file a notice of claim" pursuant to the NJTCA "is a ground for dismissal at the motion to dismiss stage." *Baker v. Fishman*, No. CV147583PGSTJB, 2017 WL 2873381, at *2 (D.N.J. July 5, 2017) (citing *William v. Westampton Police Dep't*, No. L–1144–13, 2014 WL 5393184, at *3 (N.J. Sup. Ct. App. Div. Oct. 24, 2014)). Moreover, Plaintiffs' opposition brief does set forth an adequate ground to excuse the notice requirements prescribed in the NJTCA. (*See* Pl. Opp. Br. at 62-64). Therefore, counts 15, 16, 19, and 20 are dismissed.

### B. PLAINTIFFS' TORT CLAIMS AGAINST A PRIVATE INDIVIDUAL AND ENTITY (COUNTS 21-20)

Plaintiffs assert several tort claims against Defendants Brian Hawkins (counts 21, 22, 23, and 24) and Hawk's Towing (counts 25, 26, 27, 28, 29, and 30) (and together, the "Towing Defendants").[8]

### i. GROSS NEGLIGENCE AND NEGLIGENCE (COUNTS 21, 22, 25, 26)

In counts 21 and 25, Plaintiffs assert claims for gross negligence by alleging that Towing Defendants' "willfully disregarded Mr. Forchion's ownership interest in his Van and permitted said Van to be crushed at Hawk's Towing wrecking yard." (TCAC §§ 169, 177). In counts 22 and 26, Plaintiffs assert claims for ordinary negligence by alleging that Towing Defendants' "breached [their] duty of care to Mr. Forchion by crushing his Van . . . and thereby permanently deprived Forchion of said Van." (*Id.* §§ 171, 179).

---

[8] On February 6, 2019, the Court So Ordered the Towing Defendants' motion to join the City Defendants motion to dismiss "inasmuch as [the Towing Defendants] are similarly situated as the co-defendants and any possible liability on [the Towing Defendants'] behalf is contingent on the liability and defenses of the co-defendants." (ECF No. 145).

Under New Jersey law, in order to sustain a claim of negligence, "the plaintiff must establish: (1) a duty of care owed to the plaintiff by the defendant; (2) that defendant breached that duty of care; and (3) that plaintiff's injury was proximately caused by defendant's breach." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014). "The burden of proving a negligence claim rests with the plaintiff, and as part of that burden, it is vital that plaintiff establish that his injury was proximately caused by the unreasonable acts or omissions of the defendant." *Id.*

With regard to Plaintiffs' claims of *gross* negligence, the focus is on *degree* of negligence, rather than the quality; put differently, "[g]ross negligence is defined as 'the want or absence of, or failure to exercise, slight care or diligence,' and the term 'refers to behavior which constitutes indifference to consequences.'" *Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374, at \*26 (D.N.J. Nov. 17, 2016) (quoting *Draney v. Bachman*, 351 A.2d 409, 413 (Law Div. 1976)).

Incumbent upon Plaintiffs to succeed on either the gross negligence or ordinary negligence claims is the requirement to allege plausible facts demonstrating that the Towing Defendants owed them a duty of care. *See Strachan v. John F. Kennedy Mem'l Hosp.*, 109 N.J. 523, 529 (1988) (citation omitted) ("A prerequisite to recovery on a negligence theory is a duty owed by defendant to plaintiff."). "The existence and scope of a duty are legal questions." *Broach-Butts v. Therapeutic Alternatives, Inc.*, 456 N.J. Super. 25, 34 (App. Div. 2018) (citation omitted). Determining whether to impose a legal duty "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Ross v. Lowitz*, 222 N.J. 494, 518 (2015) (citation omitted). "Such . . . 'analysis rests upon whether the imposition of a general duty to exercise reasonable care to prevent foreseeable harm is fair and just under the

circumstances.'" *Peguero v. Tau Kappa Epsilon Local Chapter*, 439 N.J. Super. 77, 89 (App. Div. 2015) (quoting *Desir, Estate of ex rel. Estiverne v. Vertus*, 214 N.J. 303, 317 (2013)); *Broach-Butts*, 456 N.J. Super. at 34 ("The '[a]bility to foresee injury to a potential plaintiff' is 'crucial' in determining whether a duty should be imposed.") (citation omitted)).

Here, the Court is not persuaded that the Towing Defendants owed a duty of care to Plaintiffs. The Towing Defendants acquired title to the van on August 1, 2016; ninety-six days after the vehicle was originally seized by Trenton police on April 27, 2016. (TCAC ¶¶ 52, 64). At the time the Towing Defendants acquired title to the van, August 1, 2016, it had already been deemed abandoned. (*Id.* ¶¶ 63, 64). Other allegations are based on "information and belief," as such the negligence counts are purely speculative. Given these circumstances, the negligence counts are dismissed for failure to state a claim. As such, counts 21, 22, 25, and 26 are dismissed.

ii. NEGLIGENCE *PER SE* (COUNTS 23, 27)

In counts 23 and 27, Plaintiffs allege that the Towing Defendants violated N.J.S.A. § 39:10A-1 by "illegally failing to provide notice to Mr. Forchion, the known owner of the vehicle, and then crushing Forchion's Van." (TCAC ¶¶ 173, 181).

"[U]nder New Jersey law, a negligence *per se* claim is supported by a violation of a statute or regulation when said statute or regulation 'serves to impose direct tort liability.'" *Kamdem-Ouaffo v. Task Mgmt. Inc.*, No. 117CV7506NLHJS, 2018 WL 3360762, at *20 (D.N.J. July 9, 2018) (citation omitted). "To begin the analysis of a negligence *per se* claim, 'the Court must first look to the statute or regulation that was violated.'" *Id.* (citation omitted). The statute or regulation must "impose direct liability or provide an independent tort remedy." *See Alloway v. Bradlees, Inc.*, 157 N.J. 221, 235 (1999). The statute at issue, N.J.S.A. § 39:10A-1, imposes neither, and Plaintiffs' claims must therefore be dismissed.

N.J.S.A § 39:10A-1 requires that notice be given to a vehicle owner prior to it being sold at an auction.[9] In the Court's view, however, this statute cannot be the basis for a negligence *per se* claim. Fatally, the statute does not impose direct liability or provide for an independent cause of action. *See Alloway*, 157 N.J. at 235. In relevant part, the statute provides that failure to issue proper notice by the person storing a motor vehicle results in a limitation on that person's ability to charge a storage fee, not liability. N.J.S.A. § 39:10A-1(a)(5)(b). Moreover, the statute does not provide for an independent cause of action, and New Jersey courts have found that it does not imply one. *See Harvey v. Twp. of Deptford*, 402 N.J. Super. 156, 165 (App. Div. 2008) (finding that N.J.S.A § 39:10A-1 did not implicitly provide a private right of action against a municipality). Therefore, the Court finds that the statute provides an insufficient basis to establish Plaintiffs' negligence *per se* claims, and counts 23 and 27 are therefore dismissed.

### iii. CONVERSION (COUNTS 24, 28)

In counts 24 and 28, Plaintiffs allege that the Towing Defendants "intentionally and unlawfully interfered with Mr. Fochion's Van by permitting it to be crushed." (*See* TCAC ¶¶ 175, 183).

Under New Jersey law, "conversion is defined as the intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Bondi v. Citigroup, Inc.*, 423 N.J. Super. 377, 431 (App. Div. 2011) (citation and quotation marks omitted). In order to sustain a cause of action for conversion, Plaintiffs must demonstrate that: (1) "the property and

---

[9] Specifically, the statute provides, "When a motor vehicle which cannot be certified for a junk title certificate . . . remains unclaimed by the owner or other person having a legal right thereto for a period of 20 business days, the motor vehicle may be sold at auction in a public place, but shall be sold no later than 90 business days after the public agency takes possession of the vehicle." N.J. S.A.39:10A-1(c).

right to immediate possession thereof belong to the plaintiff"; and (2) "the wrongful act of interference with that right by the defendant." *First Nat'l Bank v. North Jersey Trust Co.*, 18 N.J. Misc. 449, 452 (1940). "To constitute an act of conversion, '[i]t is sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it. It is the effect of the act which constitutes the conversion.'" *Charles Bloom & Co. v. Echo Jewelers*, 279 N.J. Super. 372, 381 (App. Div. 1995) (citation omitted).

As set forth above, in order to state a claim for conversion, Plaintiffs must demonstrate that they had the "right to immediate possession" of the van. *First Nat'l Bank*, 18 N.J. Misc. at 452. However, Plaintiffs' own allegations destroy any contention that they had immediate legal title to the van before it was destroyed. Plaintiffs allege that the Towing Defendants were "transferred title to the Van because it had been deemed 'abandoned'" and only crushed it after acquiring title to the abandoned property. (TCAC ¶¶ 63-65). Thus, since title of the van was transferred to the Towing Defendants, the Towing Defendants, by definition, did not interfere with Plaintiffs' right of immediate possession, and the conversion claims must therefore be dismissed. *See First Nat'l Bank*, 18 N.J. Misc. at 452. Moreover, absent from the TCAC are any nonconclusory allegations that the Towing Defendants' possession of the van was a "wrongful act." *See id.* The allegations clearly indicate that the Towing Defendants acted at the direction of the municipality (TCAC at ¶¶ 66-68); directions upon which they were entitled to rely. *See N. Haledon Fire Co. No. 1 v. Borough of N. Haledon*, 425 N.J. Super. 615, 631 (App. Div. 2012). Accordingly, counts 24 and 28 are dismissed.[10]

---

[10] In addition, there being no outstanding claim upon which Plaintiffs' *respondeat superior* claim (count 29) could be based, that count is also dismissed.

## CONCLUSION

Defendants' motions to dismiss (ECF Nos. 125, 130) are granted in part and denied in part. For the reasons stated herein, the Court will grant Defendants' motions to dismiss with prejudice counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30. Defendants' motions are denied as to counts 1, 2, 13, and 17 as interposed against Defendant Parrey, only; and counts 14 and 18 as against Defendant Haumann.

## ORDER

This matter comes before the Court on two motions filed by the defendants from the City of Trenton and the State of New Jersey. (ECF Nos. 125, 130). The motions were joined by Defendants Brian K. Hawkins Sr. and Hawk's Recovery and Towing Inc. (ECF No. 141). The Court has considered the written submissions of the parties and the arguments set forth on the record on March 20, 2019. Accordingly, for the reasons stated herein and for good cause shown:

**IT IS** on this _30_ day of September, 2019;

**ORDERED** that counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30 are hereby dismissed with prejudice; and it is further

**ORDERED** that Defendants' motion to dismiss counts 1, 2, 13, and 17 as interposed against Defendant Parrey, only; and counts 14 and 18 as against Defendant Haumann are hereby denied; and it is further

**ORDERED** that Defendants Parrey and Haumann are the only remaining defendants in this action.

PETER G. SHERIDAN, U.S.D.J.